UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES SHEPHERD, individually;

Plaintiff,

-v-

No.
Hon.

JEFFREY METZ, in his individual capacity; and CITY OF FLAT ROCK, a Municipal corporation;

Defendants.

---

**COMPLAINT AND JURY DEMAND**

NOW COMES the Plaintiff, JAMES SHEPHERD, individually, by and through his attorneys, MUELLER LAW FIRM, by WOLFGANG MUELLER, and files his Complaint against the Defendants in this civil action, stating unto this Court as follows:

1. This is an action for damages brought pursuant to 42 USC §§1983 and 1998, the Fourth, Sixth, and Fourteenth Amendments to the United States Constitution against Defendants, JEFFREY METZ, in his individual capacity; and the CITY OF FLAT ROCK, a municipal corporation. Jurisdiction is founded upon 28 USC §1331 and 28 USC §1343.

2. Forum is proper based on the situs of the incident, which occurred in the CITY OF FLAT ROCK.

3. At all pertinent times Plaintiff, JAMES SHEPHERD, was a citizen of the State of Michigan.

4. At all pertinent times, Defendant, JEFFREY METZ ("METZ"), was employed as a Det/Lt. by the Flat Rock Police Department, a department of the CITY OF FLAT ROCK ("FLAT ROCK"), a municipal corporation, and was acting under color of law.

5. At all times relevant hereto, the Defendant, FLAT ROCK, a Municipal corporation, was the employer of the individual Defendant, METZ.

## GENERAL ALLEGATIONS

6. On November 9, 2010, shortly after 8:45 p.m., Jesus Cabrera, 24, was murdered in an apartment in the Walnut Creek Apartments in Flat Rock, Michigan.

7. Cabrera was at the apartment of Christopher Henderson, who lived there with his girlfriend, Paula Illes, and their children. Cabrera, a known drug dealer, was at the apartment to sell marijuana to Henderson, as he had done on multiple prior occasions.

8. In the apartment next door were several people, including Jabrell Searcy, who was visiting and writing rap songs with his friend, Byron Mitchell.

9. Shortly before Cabrera was discovered dead in the Illes/Henderson apartment, Searcy saw two men enter the apartment building as he happened to look out the kitchen window. One of the men was Christopher Henderson, whom Searcy had known for approximately one month.

10. According to Michigan's Offender Tracking Information System ("OTIS"), Christopher Henderson, a convicted felon, was 5'7", 155 lbs.

11. At the time of the murder, Plaintiff, James Shepherd, was 5'10", 175 lbs.

12. Searcy did not recognize the other man with Henderson, who Searcy consistently described to police officers as being about the same height as Henderson, and maybe shorter.

13. Searcy would later positively identify Henderson in a photo array as one of the men he saw enter the apartment building shortly before Cabrera's body was discovered.

14. Sometime after Searcy saw the two men enter the apartment building, Paula Illes returned to her apartment. Searcy saw her and told her he had seen Henderson at her apartment. Illes was scared, as she had broken up with Henderson two days before, after he had allegedly raped her and she made a police report.

15. A 911 call was made at 9:16 p.m.

16. Flat Rock police officers responded and interviewed several witnesses, including Jabrell Searcy, Paula Illes, Byron Mitchell, and Lakeisha Andrews, who lived in the apartment next door to the Illes/Henderson apartment.

17. Defendant, METZ, was assigned as the Officer-in-Charge of the homicide investigation. Due to Flat Rock's small department and lack of resources, the Downriver Major Crimes Task Force was called to assist in the investigation.

18. Paula Illes was interviewed by police on November 9, 2010, and also provided a written statement. There was no mention of James Shepherd.

19. On November 15, 2010, Illes was subjected to a recorded interview under oath ("Investigative Subpoena"), and simply mentioned James Shepherd as one of several individuals who were friends with Christopher Henderson.

20. On November 17, 2010, Paula Illes, who was under arrest at the time, provided police with a written statement in which she claimed that two months before the murder, she overheard Henderson having a conversation with Plaintiff, where Henderson discussed robbing a drug

dealer and having to kill the dealer to avoid retribution. She claimed Plaintiff agreed with Henderson.

21. On November 18, Plaintiff voluntarily appeared at the Flat Rock Police Department and provided a written statement, noting that he was at work at a Ford Motor Company manufacturing plant at the date and time of the murder.

22. During the course of the investigation, cell phone records were subpoenaed and obtained for several individuals, including Plaintiff, Henderson, and Cabrera.

23. Police analyzed the cell phone records and cell tower locations to determine approximate locations of the cell phones at the relevant times on November 9, 2010.

24. METZ's analysis of cell phone calls between Christopher Henderson and Jesse Cabrera revealed a series of telephone calls between the two men, with the last call occurring at 8:45 p.m. on November 9. Sgt. METZ would dramatically describe that phone call in his Warrant Request as *"the last call Jesse ever makes."*

25. METZ's cell tower site analysis of Henderson and Cabrera's phone records revealed that at the time of "the last call that Jesse ever

ma[de],” Henderson’s cell phone was “pinging” off a cell tower located at 29500 Gateway in Flat Rock, less than one mile from the murder scene.

26. Given that the 911 call reporting the murder was made at 9:16 p.m., METZ knew that Jesse Cabrera was murdered between 8:45 p.m. and 9:16 p.m. on November 9, 2010, and more likely before 9:00 p.m.

27. METZ’s cell tower analysis also revealed that after the murder, when Henderson was allegedly using Cabrera’s phone, the phone was “pinging” off towers in Inkster, where Henderson grew up and still lived.

28. METZ’s investigation revealed that Henderson was driven from Inkster to Toledo by a friend immediately after the murder, and took a bus to Tennessee. Henderson was ultimately arrested in Tennessee on December 2, 2010.

29. METZ’s investigation into James Shepherd’s alleged involvement into the murder included assigning officers to visit Baskin Enterprises, Shepherd’s Romulus-based employer, on more than one occasion. Police field notes revealed that on May 17, 2011, Baskin representatives told Flat Rock investigators that Plaintiff had been employed by them and worked from 1:30 p.m. on November 9 to 2:30 a.m. on November 10. He had been working at the Dearborn Truck Plant, located at 3001 Miller Rd, Dearborn, a distance of at least 18 miles from

the murder scene. Police officers were even told of the gates through which Plaintiff would have had to enter and leave.

30. Flat Rock police officers chose not to make a written report of the interview with Baskin Enterprises representatives who corroborated James Shepherd's alibi.

31. As part of his investigation, METZ conducted a cell tower location analysis of phone calls James Shepherd made and received on November 9 and 10, 2010, similar to that conducted for Christopher Henderson and Jesse Carbrera's cell phones. Cell tower site analysis revealed that James Shepherd was in the location of the Dearborn Truck Plant during the day and evening on November 9, 2010, based on "pings" from cell towers located less than three miles from the truck plant.

32. Specifically, METZ learned that at 8:50 p.m., during the time of the murder, James Shepherd was making a phone call that lasted one minute, twenty-seven seconds. As with Shepherd's earlier calls, the cell call pinged off a cell tower in Dearborn, less than three miles from the Dearborn Truck Plant.

33. METZ's cell tower evidence was clearly exculpatory, as it confirmed that James Shepherd was nowhere near Flat Rock at the time of

the murder. Such exculpatory evidence would have been apparent to any reasonably well-trained police officer.

34. The cell tower evidence was also material impeachment evidence, as it would have impeached the testimony of police officers at trial, including METZ himself, who testified that Shepherd's presence at the Ford Dearborn Truck Plant at the time of the murder "could not be confirmed" by investigators.

35. METZ chose not to make a written report of the exculpatory cell phone tower analysis.

36. METZ also chose not to tell the prosecutor, Molly Kettler, of his findings, as Ms. Kettler would have turned the evidence over to Shepherd's defense attorney, consistent with her ethical and constitutional *Brady* obligations.

37. No physical evidence of any kind placed Plaintiff at, or anywhere near, the scene of the murder.

38. No eyewitnesses placed Plaintiff at, or anywhere near, the scene of the murder.

39. To establish probable cause that James Shepherd was present during the murder, METZ relied on a single text message from Shepherd to Henderson on November 9, 2010, at 1:20 pm, seven hours before the

murder, that stated: *"They sending me 2 work right now we gotta set it 4 2nite or n the morning."*

40. In May, 2011, in response to a search warrant for his DNA, Plaintiff submitted a sample of his DNA for testing. Testing came back negative for any evidence of Plaintiff at the scene of the murder.

41. During the investigation, police officers, including METZ, questioned Jabrell Searcy, the sole witness who saw two black males walk into the apartment building shortly before the murder. Searcy specifically told the officers that James Shepherd was <u>not</u> the second individual, as Searcy had known Plaintiff for several months before the murder.

42. No written report was made of Searcy's statement to METZ.

43. METZ deliberately chose not to show Searcy a photo lineup with Shepherd as a suspect, as he had done with Christopher Henderson as a suspect.

44. METZ's investigation also revealed that approximately one month before the Cabrera murder, Henderson had attempted to recruit several individuals to rob Cabrera, including Byron Mitchell.

45. Despite having no evidence of any kind placing James Shepherd at or near the scene of the murder, METZ submitted an Investigator's Report to the Wayne County Prosecutor's Office on October

14, 2011, seeking arrest warrants against Christopher Henderson and James Shepherd for the murder of Jesus Cabrera.

46. The Warrant Request contained numerous false statements and material omissions of evidence that would have negated probable cause.

47. The Warrant Request, on page 35, describes METZ's theory of the how the murder occurred, after eleven months of investigation:

*Jerome and Paula along with text records can tell that Chris and Jesse have been dealing marijuana with each other on previous occasions. Chris and James Shepard (sic) discuss robbing and killing Jesse which Paula overheard. On the day of Jesse's death there are many contacts between Jesse and Chris, and Chris and James Sheppard (sic). Sheppard (sic) even texts back that they have to "set it 4 2nite." Jesse and Chris communicate with each other right up to the point where Jesse calls Chris to say he's here at Walnut Creek – the last call Jesse ever makes. Chris and another* ***unknown b/m*** *are already in the apartment. The doors are secure and Jesse has to be buzzed into the building. Jesse walks up to Paula's apartment and is let in the door by Chris. Jesse feels comfortable in dealing with Henderson, they have conducted many exchanges together. Inside the apartment Chris and the* ***unknown*** *rob Jesse of his money and dope. According to Chris' plan, if they rob him they'll have to kill him. He knows them and would retaliate. So they shoot him in the apartment and Jesse dies. Chris and the* ***unknown b/m*** *leave Walnut Creek apartments and split up.*

48. The person with Christopher Henderson is repeatedly described as *"unknown b/m"* because METZ had been told by Jabrell Searcy months earlier that the second black male with Christopher Henderson that evening <u>was not</u> James Shepherd, and cell tower site

analysis had revealed that James Shepherd was in Dearborn before, during, and after the time of the murder!

49. Due to METZ's false statements and material omissions, the prosecutor recommended that an arrest warrant be authorized for Henderson and Shepherd's arrests.

50. On October 17, 2011, METZ appeared before Judge James Kersten in the 33rd District Court in Woodhaven, Michigan, to "swear to" facts in support of Henderson and Metz's arrest warrants.

51. Under oath, METZ knowingly and intentionally, or with reckless disregard for the truth, made false statements and material omissions of facts and evidence that would have negated probable cause.

52. METZ's knowingly false statements and material omissions resulted in Judge Kersten authorizing warrants for Henderson and Shepherd's arrest.

53. METZ knowingly, or with reckless disregard for the truth, made the following false statements and material omissions to manufacture probable cause and convince Judge Kersten to authorize an arrest warrant for James Shepherd:

a. Omitting the fact that the alleged conversation between Henderson and Shepherd regarding the robbing and killing of a drug dealer took place <u>two months before Cabrera's murder</u>, leaving the

impression that the conversation took place shortly before the day of the murder;

b. Omitting the fact that in the interim, Henderson had attempted to recruit others to rob Henderson's drug dealer;

c. Identifying "Witness #1," Jabrell Searcy, as having seen two men enter the building, one of whom he positively recognized as Christopher Henderson, while omitting that Searcy had affirmatively told Metz and other officers that James Shepherd was not the second individual;

d. Omitting the fact that Searcy consistently described the second individual who entered the building with Christopher Henderson as being the same size as Henderson (5'7", 155 lbs.) or smaller, while Metz knew that James Shepherd was 5'10", 175 lbs.;

e. Omitting the fact that disinterested witnesses from Baskin Enterprises, Plaintiff's employer, had confirmed that Shepherd had just been employed by Basking on November 9, 2010, and was working at the Ford Dearborn Truck Plant on the night in question, and that Shepherd could not have left the plant and returned without being noticed or let in by a Baskin representative, as he did not have a security pass;

f. Omitting the fact that cell phone tower site analysis revealed that Shepherd was in Dearborn at the time of the murder, consistent with his explanation to officers and the information provided by his employer;

g. Omitting the fact that there was no evidence, either direct or circumstantial, that placed James Shepherd at or near the murder scene at the time of the murder.

h. Falsely stating that on November 9, 2010, *"At approximately – on this date on November 9th, again, at 11:08, Shepherd and Henderson exchanged a 16-minute conversation. Within the hour, Jesse calls Chris and Henderson quickly returns the call. As soon as the conversation between Henderson and the victim, Cabrera, ends, Henderson and Shepherd exchange four quick phone calls."* In fact, Henderson and Shepherd never "exchanged" any

calls, as Henderson made four calls to Shepherd's phone that went to voice mail.

i. Falsely stating that on November 9, 2010, *"After hanging up from James Shepherd, Chris Henderson then began to contact Jesus Cabrera, and then throughout the day phone calls were made between all parties."* In fact, Shepherd never spoke to Cabrera at all, since the two did not know each other, and did not speak to Henderson after Henderson first spoke to Cabrera on November 9.

j. Other material omissions that will be discovered during the course of this lawsuit; such omissions being information that any reasonable officer would know that the judge would want to know.

54. METZ's false statements and material omissions were designed to convey an impression that Henderson and Shepherd had recently concocted a plan to rob and kill Cabrera, and continuously communicated on November 9 in furtherance of their plan.

55. Due to METZ's false statements and material omissions to both the prosecutor, Molly Kettler, and Judge Kersten, on October 17, 2011, the judge issued a warrant for James Shepherd's arrest for the crimes of first-degree murder and felony murder.

56. On or about October 18, 2011, Plaintiff turned himself in to authorities and was placed in the Wayne County Jail.

57. On June 12, 2012, James Shepherd was found guilty of first-degree premeditated murder and second-degree felony murder for the death of Jesus Cabrera.

58. On July 27, 2012, James Shepherd was given a prison sentence of life in prison without the possibility of parole. Shepherd was 28 years old.

59. Plaintiff appealed his conviction. On December 22, 2015, the Michigan Court of Appeals vacated the guilty verdict *"because it was not supported by sufficient evidence."* The Court of Appeals noted the *"complete dearth of affirmative evidence, either direct or circumstantial, that Shepherd was at the scene of the murder."* The *Shepherd* Court also noted that *"police efforts to 'confirm' the story (that Shepherd was at work at the time of the murder) were minimal at best."* The *Shepherd* court further stated that the Flat Rock police were aware that the Baskin representatives could verify Plaintiff's location at the Dearborn Truck Plant on the night in question

60. The *Shepherd* Court stated that the prosecution's theory of the case – that somehow, without being seen or missed, Shepherd left work for two hours in the middle of his shift, traveled 18 miles (without a vehicle) to commit the murder with Henderson, re-entered the Ford plant (without a security pass) and went back to his place on the line – was *"without a single witness or document in support. . . ."*

61. METZ, who sat at the prosecution table during the entire trial, knew that there was not a single witness or document to support the prosecutor's made-up theory of how James Shepherd was involved in Jesse Cabrera's murder, but never once told the prosecutor that her theory was contrary to the police evidence and made no sense.

62. While the prosecution admitted that the case against Shepherd was based purely on circumstantial evidence, the Court of Appeals stated: *"[c]ircumstantial evidence must be based on more than mere speculation or conjecture."*

63. On March 29, 2016, the Michigan Supreme Court denied the state's application for leave to appeal, *"because we are not convinced that the question presented should be reviewed by this Court."*

64. On April 5, 2016, Judge Gregory Bill of the Wayne County Circuit Court, ordered James Shepherd's release from confinement.

65. From October 18, 2011, until he was sentenced to life in prison on July 27, 2012, a period of 283 days, James Shepherd was confined in jail.

66. For the first month in prison in Jackson, Michigan, James Shepherd was placed in "quarantine" in the Cooper Street Correctional Facility while he was being processed.

67. From August, 2012, through November, 2015, a period of forty months, James Shepherd was confined to the E.C. Brooks Correctional Facility, a Level 4 prison in Muskegon, Michigan, where he was placed in a tiny prison cell for 21 hours each day.

68. From November, 2015, through April 5, 2016, a period of five months, James Shepherd was confined to the Michigan Reformatory facility, a Level 4 prison in Ionia, Michigan, where he was placed in a tiny prison cell for 23 hours each day.

69. In total, James Shepherd spent 56 months in jail or in prison for a crime he did not commit.

70. Due to the conduct of Defendants, JEFFREY METZ, and the CITY OF FLAT ROCK, as set forth below, Plaintiff, JAMES SHEPHERD, suffered the following injuries and damages:

a. Suffering a deprivation of liberty by being wrongfully incarcerated and imprisoned for a period of over four years, the majority of time being confined to his jail cell for 21-23 hours of each day;

b. Severe emotional distress for the period from his arrest to the present, including, but not limited to: the emotional distress of being charged with felony murder and facing a sentence of life in prison without the possibility of parole; being wrongfully convicted of a crime the police knew he did not commit; and being away from his young daughter;

c. Physical manifestations of emotional distress including, but not limited to, sleeplessness, irritability, loss of appetite, headaches, and other symptoms;

d. Physical injury suffered while in prison, including being stabbed multiple times;

e. Fright, shock, indignity, humiliation, and embarrassment;

f. Loss of enjoyment of daily activities including, but not limited to, seeing his child grow up;

g. Loss of employment opportunity;

h. Many of Plaintiff's injuries and damages are likely to be permanent;

i. Other damages which may be revealed through discovery.

## COUNT I
## CONSTITUTIONAL VIOLATIONS BY ALL DEFENDANTS

71. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

72. Defendants, METZ and FLAT ROCK, violated Plaintiff's constitutionally-protected rights, including his right to be free from unlawful detention without probable cause, guaranteed by the Fourth Amendment, and his right to due process and a fair trial, guaranteed by the Fifth Amendment, as applicable to the States via the Fourteenth Amendment to the U. S. Constitution, by the following conduct:

a. Defendant, METZ, is liable for federal malicious prosecution, as he influenced or participated in the initiation of criminal prosecution by intentionally, deliberately, and knowingly and/or recklessly making false statements and omissions of material information to manufacture probable cause and secure a warrant for James Shepherd's arrest;

b. Defendant, METZ, is liable for intentionally and knowingly failing to tell the prosecutor of the cell tower site analysis of James Shepherd's phone that revealed Shepherd was in the vicinity of the Dearborn Truck Plant at the time of the murder, which was material exculpatory and impeachment *Brady* evidence that would have been apparent to any reasonably well-trained police officer;

c. Defendant, CITY OF FLAT ROCK, created policies, practices and customs, including a failure to provide adequate training to its police officers, including Defendant, METZ, regarding the officers' constitutional obligation to refrain from deliberately and/or recklessly making false statements or material omissions of facts and evidence to manufacture probable cause, and to turn over material and apparent *Brady* evidence to the prosecutor, which demonstrated the CITY OF FLAT ROCK's "deliberate indifference" to the constitutional rights of its citizens, and was the moving force behind METZ's violations of Plaintiff's constitutional rights;

d. Other acts of constitutional violations that will be discovered through the process of discovery.

73. Plaintiff's constitutional rights, which were violated by Defendants, were clearly established before October 14, 2011.

74. As a direct and proximate result of the Defendants' willful violation of his constitutionally-protected rights, Plaintiff was detained

without probable cause, charged with crimes he did not commit, wrongfully convicted and imprisoned, and deprived of his liberty, causing him to suffer the injuries and damages set forth above.

WHEREFORE, Plaintiff, JAMES SHEPHERD, prays for compensatory damages in a minimum amount of Ten Million Dollars ($10,000,000), as are available pursuant to federal law. Plaintiff further seeks punitive damages, pursuant to 42 USC §1983, as to the individual Defendant, METZ, together with pre-judgment interest, costs and attorney fees in an amount to be determined by the Court.

**COUNT II**
**COMMON LAW MALICIOUS PROSECUTION BY DEFENDANT METZ**

75. Plaintiff incorporates by reference each preceding paragraph as if fully stated herein.

76. Defendant, METZ, initiated criminal prosecution against Plaintiff in state court by deliberately stating false and misleading facts, as set forth above, in his Request for Warrant, which were relied upon by the Wayne County Prosecutor's Office. METZ further continued the prosecution by knowingly, or with reckless disregard for the truth, making false statements and/or material omissions of critical facts and evidence to the district court

judge, as set forth above, to manufacture probable cause for the issuance of an arrest warrant.

77. The criminal proceedings ultimately terminated in Plaintiff's favor with the Michigan Court of Appeals vacating the conviction on direct appeal and Plaintiff's release from custody.

78. The prosecution was undertaken without probable cause and with malice; to charge a second person with the murder of Jesse Cabrera, not with the intention of bringing Plaintiff to justice for having committed the alleged murder.

79. As a direct and proximate result of METZ's willful violation of Plaintiff's right to be free from seizure and continued detention without probable cause, Plaintiff was detained without probable cause, charged with crimes he did not commit, wrongfully convicted and imprisoned, and deprived of his liberty, causing him to suffer the injuries and damages set forth above.

80. METZ is not protected by the "good faith" doctrine as he was the person who made false statements and material omissions of fact to manufacture probable cause for Plaintiff's arrest.

WHEREFORE, Plaintiff, JAMES SHEPHERD, prays for compensatory damages in a minimum amount of Ten Million Dollars

($10,000,000), as are available pursuant to state law. Plaintiff further seeks pre-judgment interest, costs and attorney fees in an amount to be determined by the Court.

MUELLER LAW FIRM

s/Wolfgang Mueller
Wolfgang Mueller (P43728)
Attorneys for Plaintiff
34405 West Twelve Mile Road, Ste. 200A
Farmington Hills, MI 48331
(248) 489-9653
wolf@wolfmuellerlaw.com

Dated: April 5, 2017

**JURY DEMAND**

Plaintiff, JAMES SHEPHERD, by and through his attorneys, MUELLER LAW FIRM, hereby demands a jury trial in this matter.

MUELLER LAW FIRM

s/Wolfgang Mueller
Wolfgang Mueller (P43728)
Attorneys for Plaintiff
34405 West Twelve Mile Road, Ste. 200A
Farmington Hills, MI 48331
(248) 489-9653
wolf@wolfmuellerlaw.com

Dated: April 5, 2017