UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES SHEPHERD,

  Plaintiff,           Civil Action No. 17-CV-11063

vs.                HON. BERNARD A. FRIEDMAN

JEFFREY METZ,

  Defendant.
_____/

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

  This matter is presently before the Court on defendant's motion for summary judgment [docket entry 37]. Plaintiff has responded, defendant has replied, and plaintiff has filed a supplemental brief citing recent case authority. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide this motion without a hearing. For the reasons stated below, the Court shall deny the motion.

  This is a police misconduct case in which plaintiff James Shepherd alleges that he was wrongfully convicted of murder because defendant Jeffrey Metz, the officer in charge of the murder investigation, withheld exculpatory information that negated probable cause. Plaintiff was tried with co-defendant Christopher Henderson over a four-week period in May and June 2012. Both were convicted of first degree premeditated murder. While the Michigan Court of Appeals affirmed as to Henderson, it vacated plaintiff's conviction "because there was insufficient evidence to support it." *People v. Henderson*, No. 312210, 2015 WL 9316507, at *1 (Mich. Ct. App. Dec. 22, 2015). In April 2016, after the Michigan Supreme Court denied the prosecutor's application for leave to appeal, *People v. Sheperd*, 876 N.W.2d 559 (Mich. 2016), the trial court ordered that

plaintiff be discharged. By that time, plaintiff had spent fifty-six months in jail and prison. Compl. ¶ 69.

In the instant action, plaintiff asserts malicious prosecution claims against defendant under federal and state law, and a due process claim under *Brady v. Maryland*, 373 U.S. 83 (1963). The Court has dismissed plaintiff's municipal liability claim against defendant City of Flat Rock. For relief, plaintiff seeks damages, costs, interest, and attorney fees.

*Background*

The Michigan Court of Appeals summarized the underlying criminal case against plaintiff as follows:

> At approximately 9:15 p.m. on November 9, 2010, Paula Illes found Jesus "Jesse" Cabrera dead inside her apartment in the Walnut Creek Apartments in Flat Rock, Michigan. Cabrera had been shot. Defendants Christopher Rishard Henderson and James Terrell Sheperd were both charged with the murder, tried jointly before separate juries, were convicted, and now appeal.
>
> \* \* \*
>
> For several months, Henderson lived with Illes and their children in Illes's Walnut Creek apartment. Approximately two weeks before the murder, they split up and Henderson moved out of the apartment complex.
>
> Illes testified that when Henderson moved out he returned his key to her, but the prosecution theorized that he had made a copy of it before doing so. Illes testified that while they lived together, the victim was Henderson's marijuana dealer and that on several occasions he had come to the apartment to sell marijuana to Henderson.
>
> Two witnesses testified that on separate occasions in the months leading to the murder that they heard Henderson talking about robbing and murdering his marijuana dealer. Illes testified approximately two months prior to the murder she overheard Henderson tell Sheperd that he planned to rob his marijuana dealer.

2

She also heard him say that it would be necessary to kill the dealer during the robbery in order to avoid the dealer taking revenge. A second witness, Byron Mitchell, who lived with his girlfriend Lakeisha Andrews next door to Illes, testified that one month before the killing, Henderson approached him and asked if he would assist in a plan to rob and murder the victim.

A third witness, Shavona Hill, testified that on the day of the murder, Henderson sent her a text stating that he was going to "hit a lick," a slang term meaning to commit a robbery.

Lakeisha Andrews, Illes's next door neighbor[,] testified that she returned home between 7 and 8 p.m. and that when she arrived in her apartment, several people were present, including her brother, her friend Jabrell "Blue" Searcy, her boyfriend Mitchell and their two children, and Sheperd's three or four year old daughter. She testified that shortly after her arrival she looked out the window and saw a Hispanic man get out of a blue Explorer and enter the building.

Searcy and Mitchell knew both defendants. Searcy testified that shortly before 9:00 p.m. he was looking out a window and saw Henderson walk up to the entry of the building with a second man. He testified that the second man was not Sheperd. Illes testified that when she returned to the building, but before she entered her apartment, Searcy told her that he had seen Henderson enter the building.

Hill gave additional testimony describing Henderson's actions after the murder. He testified that Henderson came to his house late that night with a black duffel bag, told him that he was leaving town, and asked him to get the number for the Greyhound bus station. Shortly thereafter a female friend arrived and drove Hill and Henderson to Toledo, Ohio, where Henderson got out. Illes also testified that in later phone calls, Henderson told her that his life was over and that he would be going to prison. Henderson was later apprehended in Tennessee.

In sum, the evidence against Henderson included proofs that he discussed robbing and murdering the victim on two separate occasions, was seen entering the situs of the murder before it occurred, and that, almost immediately thereafter, he undertook efforts to flee the state.

* * *

As an initial matter [regarding Shepherd], there was no forensic evidence indicating that he had been present at the crime scene. Of course, the same is true as to Henderson. However, the case and evidence against the two men differed greatly in almost all other respects.

First, no witnesses placed Sheperd at the scene of the murder, nor anywhere near it. The sole witness who saw Henderson enter the building was Searcy, who testified that he was looking out of the window shortly before the shooting and saw Henderson and a second man come up to the building. Searcy, who personally knew both defendants, testified that the man accompanying Henderson was not Sheperd. In response to questioning from Sheperd's attorney, he stated:

> Q: You didn't know who the other person [with Henderson] was; is that correct?
>
> A: Yes, sir.
>
> Q: ... [Y]ou knew my client, Mr. Sheperd previously; is that correct?
>
> A: Yes sir.
>
> Q: ... And you didn't see Mr. Sheperd that night?
>
> A: No, sir.

Thus, Searcy's testimony was not merely devoid of inculpatory evidence as to Sheperd; it was affirmative evidence that Sheperd was not with Henderson as he entered the building.[6]

Second, multiple witnesses testified that Sheperd was at work in a Ford factory from the middle of the afternoon until approximately 3:00 a.m. on the night of the murder.

Sheperd testified that he was at his grandmother's house that day and that she drove him to Baskin Enterprises, where he applied for a job at about 1:30 p.m. Baskin Enterprises provides contract labor to parts suppliers who need employees to work within Ford plants to conduct the final work on the parts they supply. Sheperd was hired by Baskin and told to begin immediately. His grandmother then drove him to

4

the Ford plant where he was met at the security gate by a van and driven into the plant. He testified that he began work at about 4:30 p.m. and worked cleaning and inspecting parts until approximately 3:00 a.m. when he left work and his grandmother picked him up. His grandmother confirmed all this in her testimony.

Although one could fairly challenge the weight of Sheperd and his grandmother's testimony, the evidence in this case went well beyond their statements. Joe Baskin, the owner of Baskin Enterprises, and Ralph Milhouse, the floor supervisor at the Ford factory on the day in question, both fully confirmed Sheperd's testimony. Baskin testified that Sheperd was interviewed by a member of his staff and was told to report to work immediately. He testified that he personally drove the van that picked Sheperd up at the security gate and took him into the plant. He produced his company's time records confirming that Sheperd was at the plant from the late afternoon until the wee hours of the next morning on the night of the murder. Additionally, Milhouse testified that he saw Sheperd at the plant that night, relieved him for bathroom breaks and for lunch, and showed him the way out of the plant at the end of the shift.

Moreover, both Baskin and Milhouse testified that it would have been impossible for Sheperd to have left during the shift and then returned to work without anyone noticing his absence. They outlined several reasons. First, Sheperd was working on an assembly line where a new part arrived at his work station approximately every minute, requiring him to make a notation in the log for each part. It would have been obvious if the notations were not made. Second, they explained that if Sheperd left the line without wiping the oil from the parts (as he was supposed to do), it would have been noticed by workers further down the line and the line would have been stopped. Third, if Sheperd had somehow left the plant without being noticed, as the prosecution theorized, he would not have been able to later return to finish the shift because one could not get through the security gate without a security pass, which Sheperd did not have. Indeed, none of the Baskin employees were provided with Ford security passes, which is the reason that Baskin would meet his workers at the security gate and drive them in.

Nevertheless, the prosecutor argued repeatedly–without a single witness or document in support–that at some time during the shift, while the assembly line was operating, Sheperd left his work station undetected, walked the mile from his work station to the gate, exited the premises, traveled to Flat Rock (by unknown means), and

participated in the murder. The prosecution theorized that Sheperd then returned to the plant, passed through the security gate despite his lack of a pass, walked the mile back to his work area, and returned to his work station without anyone noticing that a position on the assembly line had been unattended for approximately two hours.

It is not our role to reject the credibility findings of the jury. However, even assuming that the jury chose to reject the documentary evidence and testimony from two disinterested witnesses showing that Sheperd was at work, there is still a complete dearth of affirmative evidence, either direct or circumstantial[,] that Sheperd was at the scene of the murder. As noted, the sole eyewitness said that Henderson was there, but Sheperd was not.

The prosecution's response to this evidence practically reversed the burden of proof. The prosecutor argued that no one had testified that they were watching Sheperd every minute at the plant, that Sheperd had not demonstrated that the prosecution's theory was impossible, and that police investigation had been "unable to confirm" that Sheperd had been at work. The prosecutor's argument that the police "could not confirm" Sheperd's whereabouts clearly invited the jury to switch the burden of proof. Moreover, the record shows that the police attempts to "confirm" the story were minimal at best. The police first attempted to determine if Sheperd was working by mistakenly contacting an uninvolved company. When told by this uninvolved company that they had no record of Sheperd, most police efforts investigating Sheperd's whereabouts ended. Eventually, the police spoke with Baskin representatives who apparently told the officers the facts that were later testified to at trial. The officers, however, did not request Sheperd's time card nor did they subpoena any Baskin personnel to appear for an investigative deposition like several other witnesses had been required to do.

The case against Sheperd rested on three pieces of evidence. First, Illes testified that two months before the murder, she heard Henderson say to Sheperd that he planned to rob and murder his marijuana dealer. Illes testified that Sheperd said, "Yeah" in response. She did not recall him saying anything else in the conversation. Neither she nor anyone else testified that Sheperd was heard making any statement that would show any actual participation by Sheperd in discussing or planning a murder beyond the single word "Yeah." Moreover, Mitchell testified that one month later, Henderson was asking him to help kill the victim, which would be a curious action if he had already obtained Sheperd as his accomplice.

The second piece of evidence brought out in the prosecution's case was the fact on the day of the shooting, Sheperd and Henderson exchanged several text messages and telephone calls, including one message in which defendant Sheperd stated "they sending me to work right now. We got to set it 4 2 nite or n the morning." Sheperd testified that this text concerned a plan to see some girls, and there was testimony from some of the female witnesses that on the same evening they were making arrangements to engage sex for money. But even assuming the jury concluded that this reference concerned a murder plot that Sheperd had been involved in, there was still no evidence that Sheperd actually participated in the robbery or killing.

The third piece of evidence was a police officer's testimony that when asked about Henderson, Sheperd said that he did not know him. Sheperd testified that he told the police that he did know Henderson, but that they were not close. The police report of Sheperd's interview that day made no reference to him denying knowing Henderson. Accepting the officer's testimony as true, such evidence would show that Sheperd lied to the police about knowing Henderson, who had been accused of murder. While failing to admit that he knew Henderson could be consistent with guilt, it is by no means affirmative evidence of guilt.

\* \* \*

In addition, even if we could somehow construe this evidence as sufficient, we would have to reverse and remand for a new trial as it is overwhelmingly clear that the great weight of the evidence supported the defense: the sole eyewitness to the crime testified that Sheperd, whom he knew, was not present, and there was testimony from two disinterested witnesses, supported by documentation, that Sheperd was at work at a Ford plant during the entire evening and could not have been present in Flat Rock at 9:00 p.m. when the murder occurred. Moreover, unlike Henderson, Sheperd did not attempt to flee after the murder and he did not make any inculpatory statements.

---

[6] Searcy also testified that the man with Henderson was several inches shorter than Henderson. In fact, according to the Offender Tracking Information System (OTIS) and presumably apparent in the courtroom, Sheperd is three inches taller than Henderson.

7

*People v. Henderson*, No. 312210, 2015 WL 9316507, at *1-2, 6-9 (Mich. Ct. App. Dec. 22, 2015) (citation and footnote omitted).

In the instant case, plaintiff alleges that defendant omitted some facts and misrepresented others to persuade the prosecutor and the state district judge to authorize charges. Specifically, plaintiff identifies the following omissions and misrepresentations in defendant's "investigator's report," which he provided to the prosecutor on October 13, 2011 (*see* Pl.'s Ex. 6), and in his October 17, 2011, presentation to the state district judge at the "swear-to" hearing (*see* Pl.'s Ex. 13):

> 53. METZ knowingly, or with reckless disregard for the truth, made the following false statements and material omissions to manufacture probable cause and convince Judge Kersten to authorize an arrest warrant for James Shepherd:
>
> > a. Omitting the fact that the alleged conversation between Henderson and Shepherd regarding the robbing and killing of a drug dealer took place two months before Cabrera's murder, leaving the impression that the conversation took place shortly before the day of the murder;
> >
> > b. Omitting the fact that in the interim, Henderson had attempted to recruit others to rob Henderson's drug dealer;
> >
> > c. Identifying "Witness #1," Jabrell Searcy, as having seen two men enter the building, one of whom he positively recognized as Christopher Henderson, while omitting that Searcy had affirmatively told Metz and other officers that James Shepherd was not the second individual;
> >
> > d. Omitting the fact that Searcy consistently described the second individual who entered the building with Christopher Henderson as being the same size as Henderson (5'7", 155 lbs.) or smaller, while Metz knew that James Shepherd was 5'10", 175 lbs.;
> >
> > e. Omitting the fact that disinterested witnesses from Baskin Enterprises, Plaintiff's employer, had confirmed that

Shepherd had just been employed by Baskin[] on November 9, 2010, and was working at the Ford Dearborn Truck Plant on the night in question, and that Shepherd could not have left the plant and returned without being noticed or let in by a Baskin representative, as he did not have a security pass;

f. Omitting the fact that cell phone tower site analysis revealed that Shepherd was in Dearborn at the time of the murder, consistent with his explanation to officers and the information provided by his employer;

g. Omitting the fact that there was no evidence, either direct or circumstantial, that placed James Shepherd at or near the murder scene at the time of the murder.

h. Falsely stating that on November 9, 2010, *"At approximately – on this date on November 9th, again, at 11:08, Shepherd and Henderson exchanged a 16-minute conversation. Within the hour, Jesse calls Chris and Henderson quickly returns the call. As soon as the conversation between Henderson and the victim, Cabrera, ends, Henderson and Shepherd exchange four quick phone calls."* In fact, Henderson and Shepherd never "exchanged" any calls, as Henderson made four calls to Shepherd's phone that went to voice mail.

i. Falsely stating that on November 9, 2010, *"After hanging up from James Shepherd, Chris Henderson then began to contact Jesus Cabrera, and then throughout the day phone calls were made between all parties."* In fact, Shepherd never spoke to Cabrera at all, since the two did not know each other, and did not speak to Henderson after Henderson first spoke to Cabrera on November 9.

Compl. ¶¶ 41, 48, 53; Pl's Resp. Br. at 7-9 (emphasis in original). Specifically regarding the cell tower evidence, plaintiff alleges:

> 31. As part of his investigation, METZ conducted a cell tower location analysis of phone calls James Shepherd made and received on November 9 and 10, 2010, similar to that conducted for Christopher Henderson and Jesse Carbrera's cell phones. Cell tower site analysis revealed that James Shepherd was in the location of the Dearborn Truck Plant during the day and evening on November 9,

9

2010, based on "pings" from cell towers located less than three miles from the truck plant.

32. Specifically, METZ learned that at 8:50 p.m., during the time of the murder, James Shepherd was making a phone call that lasted one minute, twenty-seven seconds. As with Shepherd's earlier calls, the cell call pinged off a cell tower in Dearborn, less than three miles from the Dearborn Truck Plant.

33. METZ's cell tower evidence was clearly exculpatory, as it confirmed that James Shepherd was nowhere near Flat Rock at the time of the murder. Such exculpatory evidence would have been apparent to any reasonably well-trained police officer.

34. The cell tower evidence was also material impeachment evidence, as it would have impeached the testimony of police officers at trial, including METZ himself, who testified that Shepherd's presence at the Ford Dearborn Truck Plant at the time of the murder "could not be confirmed" by investigators.

35. METZ chose not to make a written report of the exculpatory cell phone tower analysis.

36. METZ also chose not to tell the prosecutor, Molly Kettler, of his findings, as Ms. Kettler would have turned the evidence over to Shepherd's defense attorney, consistent with her ethical and constitutional *Brady* obligations.

Compl. ¶¶ 31-36.[1]

---

[1] The cell tower location evidence consists of a list of all calls to and from plaintiff's cell phone number (xxx-xxx-9205) on November 9, 2010, along with the cell tower through which each call was routed. *See* Pl.'s Ex. 8. Most significant for present purposes, as defendant believes the murder occurred on that date sometime between 8:45 p.m. and 9:09 p.m., *see* Metz Dep. at 117, are the incoming and outgoing calls at 19:37, 19:44, 19:45, 19:50, 20:49, and 20:50, all of which pinged off of tower 078, which, according to hand-written notes in the margin, is located in Dearborn. At his deposition, defendant agreed that this handwriting "is in the style that I would write." *Id.* at 137. He also agreed that the cell tower records were significant because "[t]hey would show the proximity to where the call was made from." *Id.* at 118. Lt. Hale, defendant's partner on the case, testified that based on this cell tower location analysis, Metz told Hale that plaintiff's "cell phone was in Dearborn" at the time of the murder. Hale Dep. at 59.

*Plaintiff's Claims*

**A.** *Fourth Amendment Malicious Prosecution Claim*

Plaintiff's malicious prosecution claim is based on all of these alleged omissions and misrepresentations. Plaintiff argues that probable cause could not have been found if defendant had not made these omissions and misrepresentations.

In another recent wrongful conviction case in which plaintiffs brought malicious prosecution claims against the investigating officers, the Sixth Circuit stated:

> The Fourth Amendment begins: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Amongst other protections, this guarantee affords people the right to be free of unjust prosecution. *See Mills v. Barnard*, 869 F.3d 473, 479-80 (6th Cir. 2017).
>
> A malicious-prosecution claim has four elements: "(1) that a criminal prosecution was initiated against the plaintiff and that the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty ... apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor." *Id.* at 480 (alterations in original) (internal quotation marks omitted) (quoting *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010)).

\*   \*   \*

> The first element of the malicious-prosecution claim is met when an officer "could reasonably foresee that his misconduct would contribute to an independent decision that results in a deprivation of liberty" and the misconduct actually does so. *Sykes*, 625 F.3d at 316 (quoting *Higazy v. Templeton*, 505 F.3d 161, 177 (2d Cir. 2007)). This element is met when an officer includes "misstatements and falsehoods in his investigatory materials" and those materials influence a prosecutor's decision to bring charges. *Id.*

\*   \*   \*

11

> When a grand jury returns an indictment against a defendant, this creates a "presumption of probable cause," which is rebuttable by showing that:
>
>> (1) [A] law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly ma[de] false statements (such as in affidavits or investigative reports) or falsifie[d] or fabricate[d] evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, [we]re material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions d[id] not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).
>
> *King v. Harwood*, 852 F.3d 568, 587-88 (6th Cir. 2017).

*Jackson v. City of Cleveland*, 925 F.3d 793, 820-21 (6th Cir. 2019) (footnotes omitted).

In the present case, plaintiff has met the first element of a malicious prosecution claim because he has shown that defendant influenced or participated in the decision to prosecute. Defendant was the officer in charge of the investigation, and he authored the October 13, 2011, "Flat Rock Police Request for Warrant, Investigator's Report," which he presented to the prosecutor. Pl.'s Ex. 6. Based on this report, the prosecutor intended to seek the court's authorization of charges against Henderson and plaintiff for "first degree felony murder" and "first deg. premed. murder." *Id.* at 1. Defendant also testified at the "swear-to" hearing[2] on October 17, 2011, at the conclusion of which the state district judge found that there was probable cause to believe that Henderson and plaintiff committed "homicide - felony murder and homicide." Pl.'s Ex. 13 at 16.

---

[2] In Michigan, the "swear-to" is the hearing at which the complaining officer appears before a state district judge or magistrate, swears to the truth of the facts presented in the complaint, and seeks the judge's or magistrate's authorization – based on a finding of probable cause – for an arrest warrant. *See* Mich. Ct. R. 6.102.

The extent to which defendant influenced or participated in the decision to prosecute plaintiff for *murder* is unclear. Defendant testified that he believed a conspiracy-to-commit-armed-robbery charge could be brought against plaintiff based on the conversation between Henderson and plaintiff that Illes overheard and the "[w]e got to set it 4 2 nite or n the morning" text message that plaintiff sent to Henderson hours before the murder. Metz Dep. at 140. Defendant testified that it was the prosecutor who decided to bring a murder charge against plaintiff, *id.* at 173-74, and that defendant "[a]bsolutely" told her that "[w]e don't have any evidence that he was there," i.e., at the murder scene. *Id.* at 143. Defendant further testified that he provided the prosecutor with evidence that calls to and from plaintiff's cell phone at the time of the murder put the location of his cell phone in Dearborn, but the prosecutor dismissed this on the grounds that "just because his cell phone is in one location doesn't mean he's with it." *Id.* at 144. The prosecutor, however, testified that she does not recall defendant telling her that he had evidence locating plaintiff's cell phone in Dearborn at the time of the murder. Kettler Dep. at 32. She also denied that defendant ever told her that he believed probable cause for a murder charge against plaintiff was lacking. *Id.* at 33-35.

On these disputed facts, a jury will have to determine whether defendant influenced or participated in the decision to prosecute plaintiff for murder. While a jury might find that defendant only recommended a robbery conspiracy charge, it could instead find that he influenced the prosecutor to charge plaintiff with murder by neglecting to inform her of the cell tower evidence and that he further participated in this decision by saying nothing at the swear-to hearing when the state district judge stated in defendant's presence – after defendant's lengthy recitation of the evidence (that omitted any mention of the cell tower evidence or defendant's conclusion that the evidence failed to show that plaintiff was at the murder scene) – that he found probable cause to

13

charge both Henderson and plaintiff with felony murder and homicide. As the Sixth Circuit noted recently,

> [l]iability for malicious prosecution is not limited solely to those who made the decision to prosecute the plaintiff. Rather, liability also extends to those who significantly impacted that decision. For instance, liability extends to an officer who included falsehoods in her investigatory materials, knowing that prosecutorial reliance is likely, where those materials actually influenced the prosecutor's ultimate decision to bring charges. *Jackson v. City of Cleveland*, 925 F.3d 793, 820-21 (6th Cir. 2019) (citing *Sykes*, 625 F.3d at 316).

*Jones v. City of Elmyra*, 947 F.3d 905, 918 (6th Cir. 2020).

The third and fourth elements of a Fourth Amendment malicious prosecution claim (i.e., that plaintiff suffered a deprivation of liberty and that the criminal proceeding was resolved in his favor) are not in dispute. This leaves only the second element, namely, that there was a lack of probable cause for the criminal prosecution. Probable cause, as the Supreme Court has stated, "mean more than bare suspicion: Probable cause exists where the facts and circumstances within . . . the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (citations and internal quotation marks omitted).

Viewing the facts in the light most favorable to plaintiff, a jury could reasonably find that this element is established. Incredibly, Lt. Hale testified at his deposition that he and defendant (fellow Flat Rock police detectives who worked together in investigating this case) discussed the case and agreed that they had no evidence that plaintiff was at the scene of the murder and that they had no probable cause for a murder charge against plaintiff. Hale Dep. at 73. Likewise, defendant testified at his deposition that he had no evidence placing plaintiff at the scene of the murder, Metz

14

Dep. at 134, 141, and that he "felt and thought that we only had enough evidence to show the conspiracy charge." *Id.* at 144. Defendant also conceded that in his testimony before the state district judge at the swear-to hearing, he neglected to indicate that he had no evidence placing plaintiff at the murder scene. *Id* at 171. Defendant further conceded that the cell tower evidence showing the location of plaintiff's cell phone at the time of the murder supported plaintiff's alibi. *See supra* note 1. On this record, a jury could reasonably find that the murder charge as to plaintiff lacked probable cause. As the Michigan Court of Appeals noted, the evidence in this case regarding Shepherd "gives rise to a suspicion that defendant was somehow involved in this crime," *Henderson*, 2015 WL 9316507, at *9, but it is evident, as defendant himself has conceded, that no probable cause to charge plaintiff with murder ever existed.

A jury could also reasonably find that defendant lacked probable cause to believe that plaintiff was guilty of conspiring to commit armed robbery, the charge defendant says he believed should have been brought against plaintiff. Defendant conceded at his deposition that the only evidence[3] he had to support this charge was the conversation overheard by Illes, two months before

---

[3] Despite this concession, it nonetheless appears that defendant falsely told the prosecutor and the state district judge that he had additional information implicating plaintiff in the alleged conspiracy. For example, in his investigator's report, defendant wrote, "On the day of Jesse's death, there are *many contacts* between Jesse and Chris [Henderson], and Chris and James Shepherd." Pl.'s Ex. 6 at 35 (emphasis added). And at the swear-to hearing, after referencing plaintiff, Henderson, and Cabrera (the victim), defendant testified that on the day of the murder "*throughout the day phone calls were made between all parties*." Pl.'s Ex. 13 at 13 (emphasis added). At his deposition, however, defendant conceded that he was aware of no phone calls and only one text message from plaintiff to Henderson ("set it 4 2 nite"), not multiple messages or calls, and that he was not aware of any contacts *ever* between plaintiff and the victim. Metz Dep. at 185-88. Further, at the swear-to hearing, defendant testified that on the day of the murder "Henderson and Shepherd exchanged four quick phone calls." Pl.'s Ex. 13 at 13. At his deposition, however, defendant conceded that no calls were "exchanged," but that Henderson called plaintiff four times and that no conversations occurred because the calls all lasted between three and six seconds. Metz Dep. at 182-83.

15

the murder, in which Henderson suggested robbing and killing his drug dealer, to which plaintiff responded by saying, "Yeah"; and the text message from plaintiff to Henderson hours before the murder stating "they sending me to work right now. We got to set it 4 2 nite or n the morning." Metz Dep. at 141, 168; *Henderson*, 2015 WL 9316507, at *8. While these two statements might give rise to a suspicion that plaintiff and Henderson conspired to rob and kill the victim, they do not constitute probable cause because they are not "reasonably trustworthy information . . . sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar*, 338 U.S. at 176.

In sum, the Court concludes that defendant is not entitled to summary judgment on plaintiff's Fourth Amendment malicious prosecution claim because the third and fourth elements of this claim are undisputed and a jury could reasonably find in plaintiff's favor on the first and second elements. The Court also concludes that defendant is not entitled to qualified immunity on this claim because plaintiff's constitutional right not to be maliciously prosecuted has been clearly established since at least 2010, *see, e.g., Sykes, supra*, and the facts, when viewed in plaintiff's favor, would allow a reasonable jury to find that defendant violated this right.

**B.** *Malicious Prosecution Claim Under Michigan Law*

The parties agree that the elements of a malicious prosecution claim under Michigan law are the same as those under federal law, except that under Michigan law plaintiff must also show "that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice." *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 363 (Mich. Ct. App. 2003). Malice is equated with "reckless disregard of the rights of another." *Odom v. Wayne Cty.*, 760 N.W.2d 217, 225 (Mich. 2008).

16

For the reasons stated above, the Court concludes that a jury could reasonably find that defendant pursued charges in this case with reckless disregard of plaintiff's rights. Defendant has conceded that he had no probable cause to believe that plaintiff murdered the victim. And a jury could find that defendant had at most a suspicion, but not probable cause, to believe that plaintiff conspired with Henderson to rob and kill the victim. In addition to prosecuting plaintiff without probable cause, additional evidence of malice can be found in the false information presented in defendant's warrant request and in his false testimony at the swear-to hearing. *See supra* note 3. Therefore, defendant is not entitled to summary judgment on the grounds he suggests, i.e., that plaintiff has failed to present evidence of malice.

**C. *Brady* Claim**

Plaintiff's *Brady* claim is based on defendant's alleged failure to disclose that he possessed evidence supporting plaintiff's alibi, namely (1) the cell tower location analysis showing that, at the time of the murder, calls to and from plaintiff's cell phone "pinged" off a cell tower in Dearborn (the same city where plaintiff claimed to be working), several miles distant from the murder scene; and (2) information gathered by Lt. Hale, defendant's co-worker and fellow detective, from Baskin Enterprise representatives who confirmed that plaintiff was working at the time of the murder. *See* Pl.'s Resp. Br. at 18 ("The *Brady* evidence is Metz's knowledge of the exculpatory evidence and that he believed Plaintiff was at work at the time of the murder.").

The Sixth Circuit has summarized the elements of a civil *Brady* claim as follows:

> The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held "that the suppression by the prosecution of

17

> evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Prosecutors are not the only state actors bound by *Brady*, and "police can commit a constitutional deprivation analogous to that recognized in *Brady* by withholding or suppressing exculpatory material." *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009).
>
> *Brady* claims have three elements: "[1] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).
>
> \* \* \*
>
> As to the third element of a *Brady* claim . . . [t]o show prejudice[] Plaintiffs must show that the allegedly suppressed evidence was "material;" in other words, "that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 280, 281, 119 S.Ct. 1936.

*Jackson*, 925 F.3d at 813-15. A police officer who possesses exculpatory evidence has a "*Brady*-derived responsibility to turn over potentially exculpatory evidence to the prosecutor's office." *Moldowan*, 578 F.3d at 381 (quoting *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008)).

Plaintiff's *Brady* claim fails as to the evidence gathered from Baskin Enterprises by Lt. Hale. *Brady* does not apply to evidence that plaintiff could have discovered himself "through the exercise of reasonable diligence." *Woods v. Smith*, 660 F. App'x 414, 436 (6th Cir. 2016). As plaintiff knew how to contact Baskin Enterprises, since he had interviewed with and worked for this company, he or his defense counsel or the private investigator his defense counsel hired, *see* Def.'s Ex. 12 at 25-26, could have spoken with its representatives, and obtained whatever information this employer possessed, just as Lt. Hale did. Lt. Hale had no special knowledge or information that was

18

not equally available to plaintiff. Moreover, defendant's alleged suppression of Lt. Hale's inquiries did not prejudice plaintiff, as the company's owner, Joe Baskin, and plaintiff's supervisor, Ralph Milhouse, testified at trial and fully supported plaintiff's alibi.

However, plaintiff's *Brady* claim is supported and may proceed as to the cell tower analysis defendant performed and allegedly failed to disclose. This evidence was favorable to plaintiff in that it was highly exculpatory, as it proved that at the time of the murder plaintiff's cell phone was making and receiving calls in Dearborn, near the Ford plant where plaintiff claimed he was working and several miles away from the murder scene. *See supra* note 1. If this evidence had been produced, plaintiff also could have used it to impeach defendant's trial testimony to the effect that plaintiff's attendance at the Ford plant at the time of the murder could not be confirmed. *See* Pl.'s Ex. 9 at 56-57. Whether the evidence was suppressed is a disputed question of fact. As noted above, defendant testified at his deposition that he provided this evidence to the prosecutor, but the prosecutor testified to the contrary. The evidence was also plainly material, as it was powerful evidence that supported plaintiff's alibi. Therefore, "there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 280.

The Court concludes that defendant's summary judgment motion must be denied as to plaintiff's *Brady* claim and that this claim may proceed as to the allegedly suppressed cell tower location evidence. The Court also concludes that defendant is not entitled to qualified immunity on this claim because plaintiff's constitutional right to be provided with material, exculpatory evidence has been clearly established since 1963, *see Brady, supra*; a police officer's *Brady*-derived duty to

turn over such evidence to the prosecutor has been clearly established at least since 2009, *see Moldowan, supra*; and the facts, when viewed in plaintiff's favor, would allow a reasonable jury to find that defendant violated this right.

*Conclusion*

For the reasons stated above,

IT IS ORDERED that defendant's motion for summary judgment is denied.

s/Bernard A. Friedman
BERNARD A. FRIEDMAN
SENIOR UNITED STATES DISTRICT JUDGE

Dated: April 8, 2020
Detroit, Michigan